251 N.J. Super. 85 (1991)
596 A.2d 1105
STATE OF NEW JERSEY, PLAINTIFF,
v.
DOUGLAS BROMELL AND EDWIN G. MEIER, DEFENDANTS.
Superior Court of New Jersey, Law Division (Criminal), Monmouth County.
Decided May 30, 1991.
*87 John P. Johnston for plaintiff (John A. Kaye, Prosecutor of Monmouth County, attorney).
James Fagen, for defendant, Douglas Bromell.
Joseph Hrymack, for defendant, Edwin Meier.
O'HAGAN, J.S.C.
The defendants Douglas Bromell and Edwin Meier, by way of motion to suppress pursuant to R. 3:5-7, seek to suppress evidence seized by members of the auto theft unit of the New Jersey State Police during a search conducted at Doug's Auto Body on April 6, 1990. The respective motions were filed in a timely fashion pursuant to R. 3:5-7(a). The court has jurisdiction under R. 3:5-7(a). The principle issue in this case is whether the warrantless search of an auto body repair facility, conducted pursuant to a statute authorizing such search, falls within the exception to the warrant requirement for administrative or regulatory inspections of pervasively regulated industries. *88 This court holds that it does and therefore the defendants' motion to suppress the evidence is denied.

I.
Defendant Douglas Bromell Sr. is the owner of Doug's Auto Body, an auto-body repair facility located in Farmingdale, New Jersey. Doug's Auto Body is situated at the end of a long driveway leading in from the public street. It consists of a garage and several auto-repair bays surrounded by approximately three acres of property. No clear evidence was established concerning the existence of a fence surrounding the premises. The court drew the inference, however, that clients or customers would use the driveway to gain entrance and would do their business or negotiations in the area of the garage itself. On April 6, 1990, Detective Sgt. Robert Penrose of the New Jersey State Police Auto Theft Unit, accompanied by two other detectives from that unit, performed an inspection of Doug's Auto Body pursuant to N.J.S.A. 39:13-3 and the regulations provided by N.J.A.C. 13:21-21.1 et seq. Upon arriving at the site, the state police were approached by Douglas Bromell Jr., the owner's son. The officers asked Bromell Jr. to notify his father of their presence and awaited the arrival of defendant-owner before undertaking the inspection. Defendant, Douglas Bromell Sr., was then provided with information regarding the statutory authority and scope of the inspection. The search was limited to an examination of the owner's operating license, his employee list and a verification of proper title to all the vehicles and component parts on the site.
The inspection of Doug's Auto Body revealed that approximately 40 vehicles were on the premises. The subject of the instant suppression motion was the front clip[1] of a 1979 Corvette *89 that, because of its proximity to a rear clip from another Corvette, appeared to be one single Corvette cut in half. The testimony of Detective Sgt. Penrose revealed that there was neither a drive train nor an interior in the front clip. The front and rear clips were found behind the garage in a location not visible from the driveway or the front of the garage. Detective Sgt. Penrose candidly admitted that the customers of the business would not ordinarily go to that location. The detective's attention was drawn to the front clip because no vehicle identification number (hereinafter VIN) was found in the public location on it. The evidence revealed that the VIN had been removed, apparently intentionally. Using information provided by the manufacturer, Detective Sgt. Penrose was able to find the correct VIN. A computer lookup revealed that the 1979 Corvette was an "active theft" having been reported stolen by its owner Edwin Meier on September 30, 1989. Apparently, co-defendant Meier had received insurance monies thereafter on account of the vehicle's theft. The state police on April 6, 1990 impounded the front clip of the corvette and had it removed.
The only witness who gave testimony at the hearing on this motion was Detective Sgt. Robert Penrose, a veteran of almost 20 years with the state police. The detective indicated that as one of the 12 members of the auto theft unit of the state police, he conducts regulatory searches of auto-body repair facilities throughout the counties of Ocean, Monmouth, and Middlesex. Each member of his unit conducts between one and two searches of auto-body repair facilities each month. Although he was unable to estimate the total number of auto-body repair facilities within his region, Penrose noted that the number is in the hundreds. He stated further that some facilities have never been inspected and may never be inspected over the course of the entire life of the business. Further, once inspected, *90 the resources and manpower of the unit do not allow for a reinspection.
Seventy-five percent of all the "regulatory" inspections done by the auto theft unit are in response to a tip or information received suggesting that illegal activities are in progress. The other 25 percent of the inspections done by the unit are random spot-checks. Detective Sgt. Penrose stated that the instant search was conducted pursuant to a tip. He admitted that, but for the tip provided, Doug's Auto Body would not have been searched on April 6, 1990.
The information or "tip" that formed the basis for searching Doug's Auto Body arose in the following manner. Detective Sgt. Penrose stated that the state police had long suspected John Fernicola, the employer of defendant Meier, of involvement in auto theft activities. In the course of the Fernicola investigation, the state police spoke to his estranged wife, Rebecca Fernicola. Rebecca Fernicola revealed that Douglas Bromell Sr., the owner of Doug's Auto Body, was a good friend of her husband and was possibly involved in a car theft ring with him. Acting on this information, without a search warrant, Detective Sgt. Penrose decided to conduct an inspection of Doug's Auto Body pursuant to N.J.S.A. 39:13-3.
The State concedes that, absent statutory authority, the state police could not have validly searched Doug's Auto Body without first having secured a search warrant. The basis of the tip was speculative and the detectives did not have probable cause to believe that a crime was being committed until Bromell failed to produce proof of ownership for certain vehicles and Detective Penrose noted the missing VIN on the Corvette. Further, it has not been demonstrated that exigent circumstances existed which justified dispensing with a search warrant. The State contends, however, that N.J.S.A. 39:13-3 authorizes investigative searches in these circumstances.

*91 II.
There have been a number of United States Supreme Court and New Jersey state court decisions which have addressed the issue of administrative or regulatory inspections and have interpreted the law in a similar manner. Distilled from these cases is the principle that the Fourth Amendment prohibition against unreasonable searches and seizures is applicable to commercial business enterprises as well as private homes. New York v. Burger, 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987); See v. City of Seattle, 387 U.S. 541, 543, 546, 87 S.Ct. 1737, 1739, 1741, 18 L.Ed.2d 943 (1967); State v. Williams, 84 N.J. 217, 224-225, 417 A.2d 1046 (1980). Thus, although it is a lesser expectation than that enjoyed in the home, the owner or operator of a commercial enterprise has a legitimate expectation of privacy in commercial property. Donovan v. Dewey, 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981), State v. Turcotte, 239 N.J. Super. 285, 571 A.2d 305 (App.Div. 1990). This expectation of privacy exists with respect to administrative inspections designed to enforce regulatory schemes as well as to traditional searches conducted by police for the gathering of evidence of a crime. New York v. Burger, supra, 482 U.S. at 699, 107 S.Ct. at 2642, (citing Marshall v. Barlow's Inc., 436 U.S. 307, 312-313, 98 S.Ct. 1816, 1820, 56 L.Ed.2d 305 (1978)). State v. Bonaccurso, 227 N.J. Super. 159, 164-165, 545 A.2d 853 (Law Div. 1988).
In general, the courts agree that before a regulatory search can be undertaken an administrative search warrant must be obtained. See, e.g., Payton v. New York, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980); See v. City of Seattle, supra, 387 U.S. at 545, 87 S.Ct. at 1740. State v. Bonaccurso, supra, 227 N.J. Super. at 164, 545 A.2d 853. However, "In closely regulated industries ... an exception to the warrant requirement has been carved out for searches of premises pursuant to an administrative inspection scheme." Shoemaker v. Handel, 795 F.2d 1136, 1142 (3rd Cir.1986) cert. *92 den., 479 U.S. 986, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986) (horse racing). See also Donovan v. Dewey, 452 U.S. 594, 602-605, 101 S.Ct. 2534, 2539-42, 69 L.Ed.2d 262 (1981) (coal mines); U.S. v. Biswell, 406 U.S. 311, 316-317, 92 S.Ct. 1593, 1596-97, 32 L.Ed.2d 87 (1972) (gun selling); Colonnade Catering Corp. v. U.S., 397 U.S. 72, 76-77, 90 S.Ct. 774, 777, 25 L.Ed.2d 60 (1970) (liquor industry); State v. Turcotte, supra (horse racing); State v. Williams, 84 N.J. 217, 223, 417 A.2d 1046 (1980) (Tavern industry); State v. Rednor, 203 N.J. Super. 503, 507, 497 A.2d 544 (App.Div. 1985) (liquor industry); In re Environmental Protection Dep't., 177 N.J. Super. 304, 313, 426 A.2d 534 (App.Div. 1981) (wastewater treatment facility); State v. Bonaccurso, supra (meat-packing industry).
A warrantless inspection, however, even in a pervasively regulated industry, is reasonable only when three criteria are met. First, there must be a substantial government interest in the regulatory scheme under which the inspection is conducted. N.Y. v. Burger, supra, 482 U.S. at 713, 107 S.Ct. at 2649; State v. Turcotte, supra, 239 N.J. Super. at 292, 571 A.2d 305. Second, the warrantless search must be necessary to further the regulatory scheme. Burger, 482 U.S. at 702, 107 S.Ct. at 2644; Turcotte, 239 N.J. Super. at 292, 571 A.2d 305. Third, in terms of certainty and regularity of its application, the inspection must provide a constitutionally adequate substitute for a warrant. Burger, 482 U.S. at 702, 107 S.Ct. at 2644; Turcotte, 239 N.J. Super. at 293, 571 A.2d 305. More specifically, to satisfy the third criterion, the regulatory scheme must perform the two basic functions of a warrant by: a) advising the property owner that a search is being made pursuant to law and properly defining the scope of that search and, b) limiting the discretion of the inspecting officer. Burger, 482 U.S. at 702, 107 S.Ct. at 2644; Turcotte, 239 N.J. Super. at 293, 571 A.2d 305. When the three criteria are met, the administrative search is reasonable and "[t]he discovery of evidence of crimes in the course of an otherwise proper administrative inspection does not render the search illegal or the administrative scheme *93 suspect." Turcotte, 239 N.J. Super. at 293, 571 A.2d 305 (citing Burger, 482 U.S. at 716, 107 S.Ct. at 2651).
The administrative scheme which regulates the auto-body repair industry is codified at N.J.S.A. 39:13-3 and N.J.A.C. 13:21-21.1 et seq. N.J.S.A. 39:13-3 authorizes the investigation of complaints and the gathering of information on auto body repair facilities in an effort to detect violations of the provisions of the act and regulations adopted pursuant thereto. The regulations that have been adopted by the Division of Motor Vehicles (D.M.V.) to carry out the purposes of the statute are found at N.J.A.C. 13:21-21.1 et seq. The administrative scheme states that "[a]ny person seeking to engage in the business of an auto body repair facility shall apply ... to the Director for a license authorizing him to engage in such business." N.J.A.C. 13:21-21.4. All licensees must keep records regarding title and ownership of motor vehicles and their component parts. N.J.S.A. 39:10B-2(c). Further, each licensee is required to maintain a list of employees and copies of all estimates, work orders, invoices, parts purchase orders and appraisals prepared by that facility. N.J.A.C. 13:21-21.12.
Licensees are specifically advised of the power of the Director to order investigations by N.J.A.C. 13:21-21.17(a) which states: "[t]he Director shall, on his own initiative or in response to complaints, investigate on a continuous basis and gather evidence of violations of N.J.S.A. 39:13-1 et seq., or any regulation adopted thereunder, by an auto body repair facility." The state police are given statutory authority to act as inspectors of motor vehicles, and thus, may participate in the regulatory inspection of auto-body repair facilities. N.J.S.A. 53:2-1. When conducting a regulatory search, enforcement agencies are directed to seize and confiscate detached motor vehicle component parts if the manufacturer's part number, the identification number required by the Director in N.J.S.A. 39:10B-2, or the identification number assigned by the D.M.V. under N.J.S.A. 39:10B-3(e) have been altered, removed, destroyed, defaced or obliterated. N.J.S.A. 39:10B-3(a).

*94 III.
The preliminary issue to be resolved in this motion is whether the auto-body repair industry is closely or pervasively regulated. The very nature of the regulatory statute reveals that the operation of an auto-repair facility is a closely regulated business in the State of New Jersey. The provisions regulating the activity of auto-body repair facilities are extensive and are noted at section II above. Included among them are the requirements that all auto-body repair facilities be licensed by the State of New Jersey and maintain records regarding all employees, the title and ownership of all motor vehicles and major component parts located on their premises, and all estimates, work orders, invoices, parts purchase orders and appraisals prepared by that facility. Moreover, the person engaged in this activity is subject to criminal penalties, as well as suspension and loss of license and civil fines for failure to comply with these regulations. Accordingly, in light of the regulatory framework governing this business, the operator of an auto-body repair facility has a reduced expectation of privacy in this pervasively or "closely" regulated business.
Having determined that the auto-body repair industry is closely regulated, the court must then examine the regulatory inspection scheme in light of the three criteria previously stated. The first criterion for consideration is whether the State has a substantial interest in the regulatory scheme under which this inspection was conducted. The State indeed has a strong interest in preventing the theft and dismantling of automobiles by regulating auto-body repair facilities. "In this day, automobile theft has become a significant social problem, placing enormous economic and personal burdens upon the citizens of different states." Burger, supra, 482 U.S. at 708, 107 S.Ct. at 2647. Because of the standardization of the contemporary automobile, its component parts can easily be removed and sold for installation on similar automobiles literally anywhere in the world. "It is well established that the theft problem can be *95 addressed effectively by controlling the receiver of, or market in, stolen property." Burger, 482 U.S. at 709, 107 S.Ct. at 2647 (citing 2 W. LaFave & A. Scott, Substantive Criminal Law, § 8.10(a) at 422 (1986)). Thus, the State may rationally believe that it can help reduce automobile theft by regulations that assist in tracing the origin and destination of vehicles and their component parts and prevent auto-body repair facilities from dismantling stolen vehicles and selling their parts or using stolen auto parts to repair damaged vehicles.
Next, the court must determine whether a warrantless search is necessary to further the regulatory scheme. A warrantless search of auto-body repair facilities is necessary to further the substantial government interest in preventing auto theft and the regulatory scheme devised for that purpose. In certain situations, as noted in U.S. v. Biswell, supra,
if inspection is to be effective and serve as a credible deterrent, unannounced, even frequent, inspections are essential ... the prerequisite of a warrant could easily frustrate inspection; and if the necessary flexibility as to time, scope, and frequency is to be preserved, the protections afforded by a warrant would be negligible. [406 U.S. at 316, 92 S.Ct. at 1596].
When dealing with the prevention of auto theft, a warrant requirement would interfere with the statute's purpose of identifying stolen vehicles and component parts and shutting down the market for such items. Stolen cars and parts move quickly through auto-body "chop shops" and frequent and unannounced inspections are necessary in order to detect them. Thus, the elements of speed and surprise are essential to the regulatory scheme aimed at combatting this type of crime.
The third criterion for the court's consideration is whether, in terms of certainty and regularity of its application, the inspection scheme provides a constitutionally adequate substitute for a warrant. Defendant contends that the State has failed to satisfy this third criterion.
To satisfy this third criterion, the regulatory scheme must perform the two basic functions of a warrant by: a) advising the property owner that a search is being made *96 pursuant to law and properly defining the scope of that search and, b) limiting the discretion of the inspecting officer. Generally, to perform this first function the regulation must be "sufficiently comprehensive and defined that the owner of the commercial property will be subject to periodic inspections undertaken for specific purposes". Donovan v. Dewey, supra, 452 U.S. at 600, 101 S.Ct. at 2539. To perform this second function, the regulation must limit the discretion of inspectors so that the search is carefully limited in time, place and scope. Biswell, supra, 406 U.S. at 315, 92 S.Ct. at 1596. Warrantless searches are intended to be flexible as to time, scope and frequency. Id. at 316, 92 S.Ct. at 1596. What must be avoided is the "almost unbridled discretion" left to the searching officers "as to when to search and whom to search." Marshall v. Barlow's, Inc., supra, 436 U.S. at 323, 98 S.Ct. at 1826.
Defendant Bromell contends that Sgt. Penrose and his colleagues from the auto-theft unit were not conducting an administrative or regulatory search at Doug's Auto Body. Rather, defendant asserts the state police were expressly looking for evidence of criminal activity. Defendant maintains that Sgt. Penrose merely used the regulations as a ruse or pretext in hope of validating what would otherwise be an unlawful search. Further, Bromell maintains that the discretion given to the field officers clearly exceeds that allowed under a regulatory scheme of inspection.
Defendant, in this regard, challenges the field officers' actions in targeting defendant's place of business after receipt of the tip or information from Rebecca Fernicola. Since three out of every four inspections by the auto-theft unit are in response to such tips, defendant, in effect, is challenging the regulatory scheme for auto-body facilities throughout the entire State of New Jersey.
The State, in defending the police action, points to the statute and the administrative code, both of which expressly state that administrative searches may be undertaken at random *97 or in response to information received. Clearly, however, neither the Division of Motor Vehicles nor the State Legislature may adopt laws or regulations in violation of the Constitution. U.S. v. Villamonte-Marquez, 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983). With this principle in mind, the court must analyze whether regulatory searches can be conducted on the basis of tips and information or whether such searches must be completely random based on scheduled patterns of regularity.
While the federal courts have adopted somewhat conflicting positions in resolving cases of this nature, the New Jersey courts have been firm and consistent in the manner in which they resolve these issues. The court will examine the federal case law first. Generally, regulatory inspections are subject to the same review standard regardless of whether violations of the criminal law are suspected. U.S. v. Consolidated Coal Company, 560 F.2d 214 (6 Cir.1977). Regarding inspections conducted in a random manner according to scheduled patterns of regularity, the Supreme Court in Donovan v. Dewey, supra, indicated that support for the validity of an inspection or search of mines was found in the scheduled frequency of the inspections suggesting that the "warrantless inspections of commercial property may be constitutionally objectionable if their occurrence is so random, infrequent, or unpredictable that the owner, for all practical purposes, has no real expectation that his property will from time to time be inspected by government officials." 452 U.S. at 599, 101 S.Ct. at 2538.
Concerning the practice of conducting regulatory inspections pursuant to tips, the United States Circuit Court of Appeals for the Sixth Circuit in 1982 upheld an inspection notwithstanding the fact that it was in the context of a search of a pharmacy based on suspicion of criminal activities. An administrative search warrant had been secured in that case but no showing of probable cause had been made which would have justified a traditional search warrant. The court carefully noted that the *98 inspection was made pursuant to a regulatory statute that imposed both civil and criminal penalties for its violation. The court ruled that "the validity of the administrative warrant should depend not upon the motivation of the inspector but upon the scope of the search and the manner in which it was conducted." U.S. v. Acklen, 690 F.2d 70 (6 Cir.1982). The Sixth Circuit also stated that "in the context of regulatory enforcement, we are loath to attribute conclusive legal significance to the apparent focus of an investigation ..." U.S. v. Consolidated Coal Company, supra, 560 F.2d at 221. Along similar lines, the United States Supreme Court in New York v. Burger, supra, upheld a regulatory search even though its purpose may have been to discover evidence of criminal violations as opposed to the discovery of wrongs that could be addressed by civil remedies. Further, the case of U.S. v. Biswell, supra, suggests by inference that criminal activity was suspected on the part of the gun dealer whose premises were inspected. Thus, a city police officer accompanied a federal treasury agent at the time the inspection was made and the inspection was declared valid.
In contrast to this line of cases is the reasoning found in U.S. v. Russo, 517 F. Supp. 83 (E.D.Mich. 1981), and Shoemaker v. Handel, 795 F.2d 1136. In Russo, the United States District Court for the Eastern District of Michigan struck down an administrative search warrant when the focus of the investigation was evidence of a crime having been committed. In such circumstance, the court held, the police should have secured a traditional search warrant based on probable cause. In the matter of Shoemaker, the United States Court of Appeals for the Third Circuit considered the issue of limiting discretion in the context of mandatory drug testing of jockeys in New Jersey. The court upheld the practice of testing jockeys randomly selected by lottery. The court in an opinion written by Judge Gibbons explained that "random searches and seizures that have been held to violate the fourth amendment have left the exercise of discretion as to selected targets in the hands of *99 a field officer with no limited guidelines." 795 F.2d at 1143. The Circuit Court noted that the regulatory practice in question left no discretion to the state steward to conduct the search; the regulation mandated that he conduct the searches. Since the targets of the search were selected by lottery, the steward did not have any discretion in their selection, and thus, the court upheld the search.
Generally, the cases seem to turn on the need for state inspection, the extent or thoroughness of the regulations adopted and whether the search was conducted within the scope of the regulations. As earlier noted, auto theft in New Jersey and throughout the United States has become a most significant problem. There is a real pressing state need for regulations of the type now under consideration. Those regulations in New Jersey are extensive and provide for both civil and criminal remedies. The thrust of these regulations addresses, among other things, the need in the civil realm for the protection of the consumer in the customer-body shop relationship underscoring the need for fair treatment of the customer. Further, the regulations and statute address criminal wrongs inclusive of dealing in stolen auto parts. No one disputes that the auto theft unit of the state police searched defendant's premise within the scope of the regulations. In this regard, the search was delayed pending the arrival of the owner at which time the state police carefully explained the legal basis for the search and, in explicit terms, the scope of the search itself.
It is important to note the direction taken by the New Jersey Supreme Court and Appellate Division of the Superior Court in cases of this nature. These courts of higher jurisdiction have consistently viewed searches such as the one under consideration here to be valid and lawful. Thus, in State v. DeMarco, 157 N.J. Super. 341, 384 A.2d 1113 (App.Div. 1978) the appellate court expressly noted that the Division of Motor Vehicles had searched defendant's auto-body shop specifically because of a suspicion that a crime had been committed. The court upheld the search. More recently in the matter of State v. Williams, *100 84 N.J. 217, 417 A.2d 1046 (1980), the New Jersey Supreme Court indicated that if representatives of the State Alcoholic Beverage Control had searched the licensed tavern to secure evidence of a crime the search would have been upheld. The search in that case was struck down only because those searching the premises were without legal authority. That is, local police officers were not the enforcers of the Alcoholic Beverage Commission's regulations. To the same effect, the Appellate Division in the matter of State v. Rednor, 203 N.J. Super. 503, 497 A.2d 544 (App.Div. 1985), expressly upheld an administrative search even though it was utilized in aid of a search for criminal activity. See also State v. Ransom, 169 N.J. Super. 511, 405 A.2d 411 (App.Div. 1979); State v. Zurawski, 89 N.J. Super. 488, 215 A.2d 564 (App.Div. 1965). The courts in New Jersey have consistently ruled that the motive of the police officer conducting the search or inspection is irrelevant. Rather, an objective analysis must be made to determine whether there is a legislative scheme or policy supporting the search. State v. Rednor, supra.

IV.
Because the instant inspection clearly falls within the regulatory scheme created for the auto body repair industry, and bearing in mind the consistent themes of legal analysis in the federal and state courts, this court concludes that the auto-theft unit of the New Jersey State Police had the lawful authority to search Doug's Auto Body on April 6, 1990. Since the search was within the scope of the regulatory scheme, defendant's motion to suppress evidence of the search must be denied.
NOTES
[1] "Clip" is a term in the auto repair industry referring to that portion of an automobile located between: a) the dashboard or cowl and the front bumper in the case of a "front clip" or b) the C-pillar or package tray area and the rear bumper in the case of the "rear clip."